Lesha K. CUESTA, Plaintiff,

.v.

TEXAS DEPARTMENT OF CRIMINAL JUSTICE, et al.

Civ. A. No. SA–90–CA–1019.

United States District Court,
W.D. Texas,
San Antonio Division.

Nov. 1, 1991.

Ricardo J. Navarro, Denton, McKamie & Navarro, San Antonio, Tex., for plaintiff.

Lesha K. Cuesta, pro se.

Tammy L. Stroud, Texas Atty. General's Office, Austin, Tex., for defendants.

## MEMORANDUM AND ORDER

PRADO, District Judge.

On October 1, 1991, the Court held a bench trial in the above-styled and numbered cause. Pursuant to Rule 52(a), the Court enters the following findings of fact and conclusions of law.

Plaintiff brought suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2, alleging that the Defendants subjected her to sexual harassment while she worked for the Texas Board of Pardons and Paroles as a parole officer. The action was tried to the court without a jury. After carefully considering all the evidence and arguments of counsel, the Court concludes that Plaintiff has sufficiently carried her burden under the law to be entitled to a judgment against Defendants.

## I. Introduction

Defendant Texas State Board of Pardons and Paroles is a state agency charged with the administration of the Texas parole system. Its mission is "to provide protection and reduce social, economic and human losses to the public because of anti-social behavior; and to provide counseling, advisory and support services to the client to assure that he/she will rejoin society as a productive contributing member with maximum safety." Personnel Manual, Defs. exhibit D–3, page I–1.

The Board employs approximately 1000 parole officers, who are divided among ten regions throughout the state. The Board is organized in a hierarchical command structure, so that each employee is made aware of his or her position with regard to supervisors and subordinates. At the bottom of the hierarchy is the Parole Case Worker II ("PCW"), which is the entry-level position occupied by Plaintiff during the relevant time period. The PCW is supervised by the unit supervisor, who in turn reports to the District Parole Officer. The Regional Supervisor oversees the District Parole Officers and all other workers within the region.

As an agency that both enforces the law and counsels people seeking to conform their behavior to societal norms, the Board demands high standards of professionalism from its employees. This code of conduct is reflected to some extent in the Personnel Manual's section on sexual harassment and in the testimony of some of the witnesses as to the Board's view of sexual harassment. William H. Brooks, who was Executive Director during the relevant period, stated emphatically that any charge of sexual harassment is taken very seriously. We will later address whether these concerns were adequately implemented in practice as part of the Board's policy.

On August 8, 1988, Defendant Board hired Plaintiff as a Parole Case Worker II for its San Antonio II Office, where Defendant Keith Van Dine was the Regional Supervisor. She quit on January 4, 1989. Both parties agree that Ms. Cuesta was unhappy at her new job because of a diffi-

cult relationship with her immediate supervisor, Ms. Juanita Gonzales. (In fact, she had sought a transfer to another supervisor within the same district before quitting.) The source of this friction, however, is in dispute. Defendants claim that Ms. Cuesta simply could not get along with Ms. Gonzales, and preferred to work under a male supervisor. Plaintiff maintains that her working situation was made intolerable by Mr. Van Dine's sexual advances and explicit remarks, and that Ms. Gonzales was purposefully making life difficult for Ms. Cuesta at Mr. Van Dine's direction.

Plaintiff filed a claim with the EEOC on January 17, 1989. Meanwhile, the Texas Commission on Human Rights issued its own report on February 27, 1990, finding that there is no reasonable cause to believe the allegation to be true. The EEOC issued its right-to-sue letter on May 22, 1990, and Plaintiff filed her complaint on August 22, 1990. Plaintiff filed her suit on August 22, 1990. In her complaint, Plaintiff charges that she is entitled to recover under Title VII for constructive discharge as a result of sexual harassment by her employer. Plaintiff sought back-pay and reinstatement, although at trial she dropped her demand for reinstatement, seeking instead back pay, a declaratory judgment, and attorney's fees.

## II. The Legal Standards.

### A) *Sexual Harassment.*

Although sexual harassment as a cause of action arises under the Civil Rights Act of 1964, only recently have courts delineated the elements of a sexual harassment suit. The Fifth Circuit has defined the prima facie case elements of a sexual harassment suit as:

(1) [t]he employee belongs to a protected group ...;

(2) [t]he employee was subject to unwelcome sexual harassment, i.e. sexual advances, requests for sexual favors, and other verbal and physical conduct of a sexual nature that is unwelcome in the sense that it is unsolicited or unincited and is undesirable or offensive to the employee;

(3) [t]he harassment complained of was based upon sex ...;

(4) [t]he harassment complained of affected a "term, condition or privilege of employment," i.e., the sexual harassment must be sufficiently severe as to alter the conditions of employment and create an abusive working environment;

(5) [r]espondeat superior, i.e., that the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Waltman v. International Paper Co.*, 875 F.2d 468, 477 (5th Cir.1989) (*citing Jones v. Flagship International*, 793 F.2d 714, 719–20 (5th Cir.1986)).

Element (1) requires a mere showing that Plaintiff was female. Element (2) entails something more than "[flirting, some casual touching, and sexual innuendos or jokes." *Valdez v. Church's Fried Chicken, Inc.*, 683 F.Supp. 596, 620 (W.D.Tex. 1988).

Element (3) likewise is not normally difficult for a plaintiff to establish, beyond a showing that male employees were not treated in the same manner. Element (4), on the other hand, usually engenders some controversy. If Ms. Cuesta can prove a *quid pro quo*, i.e., that Mr. Van Dine demanded capitulation to his advances in return for perks on the job, then she has shown that the harassment altered a term or condition of employment. But a plaintiff can also proceed under a theory of constructive discharge, claiming that her work environment was so intolerable that she had to quit. This does not require exacting proof that the harassment was made with the intent to cause plaintiff's departure. *See Waltman*, 875 F.2d at 477–78 (holding that an employer is not entitled to summary judgment when there was evidence of sexual touching, comments and graffiti in the work place). However, it does involve a "commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment." *Jones v. Flagship International*, 793 F.2d 714, 720 (5th Cir. 1986).

■ Element (5) is another battleground in any sexual harassment suit. The Supreme Court has left open the issue of when an employer is liable for an employee's sexual harassment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). It seems clear, however, that a plaintiff cannot rely solely on respondeat superior. In other words, employers are not automatically liable for violations of Title VII by their employees during the course of employment. Plaintiff must show that the employer had some knowledge of the abuse, either actual or constructive. *Jones v. Flagship International*, 793 F.2d at 720. Actual knowledge could take the form of Cuesta's complaints to her supervisors, while constructive knowledge might be proven if the abuse were so pervasive that the Board should have known about it. *Waltman*, 875 F.2d at 478.

■ Plaintiff must also show that the Board failed to take prompt, remedial action. This will be a fact question, weighing the severity of the abuse with the adequacy of the response. The Board has a grievance procedure in place, and an official policy prohibiting sexual harassment. However, this is not always enough to insulate the employer from liability. *Meritor*, 477 U.S. at 71, 106 S.Ct. at 2408.

B) *Liability As An "Employer."*

■ Mr. Van Dine has also been named as a defendant. Only "employers" and their agents are liable under Title VII (as defined in that Act), so to obtain a judgment against Mr. Van Dine personally, Plaintiff will have to show that Mr. Van Dine was an agent of the Board. 28 U.S.C.A. § 2000e–2 (1981); *Kelly v. Richland School District 2*, 463 F.Supp. 216, 218 (D.S.C.1978). Under traditional agency theory, the Court finds that Mr. Van Dine had authority to hire, fire, and perform other employer functions. The parties agreed to as much in the pretrial order, where they stipulated that "Van Dine had the authority to hire, discipline, and demote employees in the San Antonio Offices of the [Board]." Mr. Van Dine also testified to his supervisory powers. Defendants argued that Mr. Van Dine did not have the ultimate authority to fire, and that his recommendations for discharge of an employee had to be approved by the central office in Austin. However, the Court determines that this formal procedure did not divest Mr. Van Dine of authority so to relieve him from personal liability under Title VII.

III. Evidence of Sexual Harassment.

A) *Credibility of the Witnesses.*

Both parties characterized the case as a "swearing match," in that the fact-finder would have to evaluate the credibility of conflicting oral testimony as to the same events. This is predictable in a sexual harassment case, where much of the alleged activity occurs in private, without documentation and beyond the observation of third parties. Here, Ms. Cuesta testified to a series of events that Mr. Van Dine swore never happened. A large part of the Court's task consequently became evaluating the testimony and determining whom to believe.

The Court has trouble granting credibility to much of Mr. Van Dine's testimony. His demeanor was defensive and evasive. He made blanket denials of any harassment or improper interview questions. Mr. Van Dine contradicted his own witnesses when he denied that, as a result of complaints about his interview techniques, the personnel office instructed him to have a third party present when he conducted interviews, or that he was insulted by this requirement. When confronted with discrepancies between his own testimony and that of Ms. Cuesta, Mr. Van Dine launched into an improbable conspiracy theory, charging that a host of people—including some hitherto unrelated to the case—were plotting his downfall.

The Court must also consider the testimony of other witnesses that corroborated Ms. Cuesta's claims. It is difficult to believe that all the people who appeared on behalf of the Plaintiff did so out of spite arising from Mr. Van Dine's position as Supervisor, or were part of the conspiracy to discredit Mr. Van Dine. Indeed, some of

Ms. Cuesta's witnesses appeared on behalf of the plaintiff only because they were under subpoena. They feared that their testimony would result in repercussions back at the office.

It is true that the Defendants presented many credible witnesses who asserted that there was not a hostile environment towards all the female co-workers at the San Antonio II office. But these witnesses could not testify as to what happened in private to Ms. Cuesta or other targets of abuse. All they could say was that Mr. Van Dine did not harass them. There was some evidence that Mr. Van Dine chose his victims carefully, seeking those women who were vulnerable and not likely to fight back.

On the other hand, the Court found little reason to doubt most of Ms. Cuesta's testimony. Her demeanor was candid, and she was willing to admit gaps in her memory as well as facts that damaged her case. The only defense witness who directly contradicted her testimony was Mr. Van Dine himself, whom the Court has already found reason to disbelieve.

### B) *Elements of Plaintiff's Prima Facie Case.*

#### 1) Initial Observations.

There is no dispute that Ms. Cuesta, as a woman working for a male supervisor, is a member of a protected class under Title VII. It is also clear that the harassment complained of was based on gender, in that Mr. Van Dine would not have acted the same way had Ms. Cuesta been male. Neither of these elements have created much controversy in the case law or among these parties, so the Court will concentrate on the remaining three elements of plaintiff's prima facie case: whether the harassment was unwelcome; whether there was a hostile environment or quid pro quo; and whether the employer had knowledge of the abuse.

#### 2) Did Plaintiff Invite the Harassment?

■ The defendants allege that Ms. Cuesta may have invited the harassment. Mr. Van Dine testified that soon after Ms. Cuesta began work at the San Antonio II office, she began calling him frequently on the phone, asking how his day had been, and otherwise discussing non-business matters. He said that she once offered him a gift, but that he declined because he felt uncomfortable with the relationship. Mr. Van Dine further claimed that at a regional function, Ms. Cuesta came up behind him and rubbed his back, asking if his wife were there. All this testimony would tend to show that Mr. Van Dine's sexual advances, if any, were welcome, and therefore did not constitute sexual harassment.

Ms. Cuesta, however, denies these allegations. She testified that at the time she was employed at the San Antonio II office, she was happily married. At her interview for the position, Mr. Van Dine asked his customary questions as to her marital status, and what kind of relationship she had with her husband. He explained that his reason for asking the question was because he did not want a jealous husband on his doorstep. Ms. Cuesta testified that she told Mr. Van Dine that she was not interested in having an affair. Finally, witnesses recalled seeing Ms. Cuesta visibly upset after encounters with Mr. Van Dine, suggesting further that she did not welcome his advances.

The issue is complicated somewhat by Ms. Cuesta's own testimony that she initially went along with Mr. Van Dine's overtures. He asked her to lunch and, although she felt uncomfortable about going, she accepted because she felt that she owed him something for hiring her. In November of 1988, Mr. Van Dine asked Ms. Cuesta if she would have an affair. She declined, stating that she was married. He replied, "Can I at least hug you, kiss you, put my arms around you? Is that too much to ask?" Ms. Cuesta finally agreed to rub his shoulders, and did so for about 20 to 30 seconds. Although she testified that she felt stupid giving in, she also felt that she got off easy, considering what his initial request had entailed.

The Court finds that Ms. Cuesta neither invited nor welcomed Mr. Van Dine's advances. We must, however, also consider the degree of the uninvited behavior. *Val-*

*dez v. Church's Fried Chicken, Inc.,* 683 F.Supp. at 620. The facts here go beyond inoffensive, friendly exchanges. At one point, Mr. Van Dine called Ms. Cuesta on the phone and used vulgar language to ask whether she preferred vaginal or anal sex. He continued to ask her to have an affair with him, despite her clear intentions to remain faithful to her husband. He told her that he wanted to assign her to a distant county so they could meet away from San Antonio. Mr. Van Dine's behavior was clearly beyond what is socially acceptable for a supervisor.

### 3. Did the Harassment Alter a Term Or Condition Of Employment?

■ Closely related to the preceding inquiry is the question of whether the harassment altered a term or condition of employment. This area falls into roughly two categories—the quid pro quo charge and the hostile environment charge. *Jones v. Flagship International,* 793 F.2d at 719–22, *citing Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982). If a plaintiff proves a quid pro quo, or an exchange whereby the supervisor demands sexual favors from the employee in return for favorable job treatment, then a term or condition of employment has been altered. *Jones,* 793 F.2d at 721–22.

■ Here, Ms. Cuesta testified that soon after she accepted her new position at the San Antonio II office, she learned that she would be subject to a background check. This caused her some concern, because in 1971 she had been charged with possession of marijuana. (Her charges were later "no-billed"). She went to Mr. Van Dine and asked him if this would create a problem, and he replied "if you take care of me, I'll take care of you." His way of saying this made her feel uncomfortable, and later made her think that if she capitulated to his sexual advances, she might get favorable treatment in the background check.

Later, Ms. Cuesta's supervisor investigated discrepancies in Ms. Cuesta's mileage reports. She asked Mr. Van Dine about this, and he replied that if a supervisor wanted to get you, it would be a simple matter. As an example, he said that if a parolee failed to check a box on the release form, the case worker could be held accountable. Again, he implied that "if you take care of me, I'll take care of you." All this evidence tends to show that Mr. Van Dine expected Ms. Cuesta to go along with his sexual advances, or else she would suffer repercussions in her job.

The Court does not find, however, that Cuesta suffered increased scrutiny of her job performance by her immediate supervisor due to her refusal to capitulate to Mr. Van Dine's advances. Plaintiff's case included the theory that there were a group of women in the office, known as "Keith's Angels," who received favorable treatment from Mr. Van Dine. Ms. Cuesta's immediate supervisor, Juanita Gonzales, was named as one of "Keith's Angels." Plaintiff believed that Mr. Van Dine was instructing Ms. Gonzales to increase supervision of Ms. Cuesta in retaliation for her rebuffing him. However, Ms. Gonzales denied that Mr. Van Dine ordered this action, and the Court found her to be a credible witness. Ms. Gonzales testified that her supervision of Ms. Cuesta was routine. Jay Moore also testified that Ms. Cuesta was investigated simply because there were discrepancies in her mileage reports.

The Court concludes that although Mr. Van Dine made demands that could be interpreted as a quid pro quo, they did not result in a tangible job detriment. Mr. Van Dine stated that if Ms. Cuesta had an affair with him, she would receive preferential treatment. However, Mr. Van Dine did not enforce the terms of this "agreement"—there is no indication that Ms. Cuesta's background search was altered at Mr. Van Dine's direction, nor are we convinced that Ms. Cuesta suffered increased job scrutiny in retaliation for rebuffing Mr. Van Dine. Ms. Cuesta claimed that Mr. Van Dine improperly denied her request for an inter-office transfer to another immediate supervisor. But such transfers are rarely granted, and Ms. Cuesta withdrew her request before a final decision was made. In any event, it is unclear what the damages would be in such a situation.

The law is clear, however, that a plaintiff in a sexual harassment suit need not prove a quid pro quo or tangible job detriment in order to recover a judgment. *Jones*, 793 F.2d at 720. The harassment must be sufficient to affect the psychological well-being of the employee, which requires a "commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment." *Id.*

The Court finds that the Plaintiff has met this burden of proof. The plaintiff testified that at first she did not find Mr. Van Dine's behavior to be threatening. As time went on, however, the abuse continued, and Ms. Cuesta's psychological well-being suffered. Ultimately, she felt she could no longer work in the hostile environment and had to quit. Manuel Cuesta, Ms. Cuesta's husband, testified that during the relevant time period, her mood changed from outgoing to depressed. Co-workers reported seeing her distraught on numerous occasions, which they attributed to her encounters with Mr. Van Dine. Even Ms. Gonzales, her immediate supervisor, was at a loss to explain why Ms. Cuesta was so dissatisfied with her supervision and unhappy in her job. Although the Court has discounted any collusion between Ms. Gonzales and Mr. Van Dine, it is clear that Ms. Cuesta perceived a connection between the two, and consequently felt trapped.

### 4) Did the Board Have Knowledge of Mr. Van Dine's Actions?

The Court has already determined that Mr. Van Dine's actions constituted sexual harassment in violation of Title VII. We must, however, determine whether the harassment can be attributed to the Board such that it would be liable under Title VII. To some extent, this issue remains unsettled. This Court has previously held that an employer must have actual or constructive knowledge of the harassment. *Valdez*, 683 F.Supp. at 620. The Supreme Court has suggested that "absence of notice to an employer does not necessarily insulate that employer from liability." *Meritor Savings Bank*, 477 U.S. at 72, 106 S.Ct. at 2408. The Fifth Circuit has yet to resolve this uncertainty. *Waltman*, 875 F.2d at 478.

This case does not squarely present the issue, however, because the Court finds that the Board had both actual and constructive knowledge sufficient to impute liability to the employer. If the harasser is an agent of the employer, then the employer necessarily has knowledge of the agent's actions. We have already determined that Mr. Van Dine was an agent of the Board under traditional agency theory. The employer is directly liable for the actions of its agents under Title VII. *Vance v. Southern Bell Telephone & Telegraph Co.*, 863 F.2d 1503, 1512 (11th Cir.1989), *citing Henson*, 682 F.2d at 910.

The Court also finds that the Board had constructive knowledge of Mr. Van Dine's harassment. Plaintiff produced considerable evidence that the abuse was widespread during the relevant period. Mr. Van Dine routinely asked inappropriate questions during interviews. Ursula Hernandez testified to similar incidents of abuse by Mr. Van Dine. Aurora Wagar testified that during her initial audit, Mr. Van Dine used obscenities to ask if she performed fellatio. He also offered to pull down his pants for eleven dollars. All this evidence serves to show that there was sexual harassment at the San Antonio II office sufficiently egregious and at a high enough level that the Board should have been put on notice.

### 5) Constructive Discharge

Because she quit her job, Plaintiff must prove that she suffered a constructive discharge. The EEOC endorses an objective test for proving constructive discharge, whereby the charging party must establish:

1) that a reasonable person in the charging party's position would have found the working conditions intolerable;

2) that conduct which constituted a Title VII violation against the charging party created the intolerable working conditions; and

3) that the charging party's involuntary resignation resulted from the intolerable working conditions.

Barbara L. Schlei & Paul Grossman, Employment Discrimination Law 268–69 (David A. Cathcaret et al. eds., 2d ed. Supp. 1989). These tests apply mainly to the employee's behavior, but the court must also examine the employer's actions to determine whether "the employer *deliberately* [made] the employee's working conditions so intolerable that the employee was *forced* into an involuntary resignation." *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 310 (5th Cir.1987) (Jones, J., adding emphasis to passage from *Wilkins v. University of Houston*, 654 F.2d 388, 390 (5th Cir.1981)).

■ The Court finds that a reasonable person would have considered the working conditions at the San Antonio II office to be intolerable. It is also clear that the sexual harassment created the intolerable environment. The Court does not find, however, that Ms. Cuesta's resignation resulted solely from the harassment. Her main reason for leaving was that she perceived that Ms. Gonzales acted as a go-between for Mr. Van Dine, and thereby cooperated in the harassment. The Court has already discounted this theory. The Court also is not convinced that Ms. Cuesta was *forced* into resigning. She had open to her other alternatives, including filing a grievance with the Personnel Department or a member of management with supervisory authority over Mr. Van Dine himself. Ms. Cuesta accordingly has failed to show constructive discharge.

In conclusion, the Court finds that Plaintiff has established all the elements of a prima facie sexual harassment case. Her claim is based on a hostile environment only, with no showing of quid pro quo or constructive discharge. We will now consider the Board's defense to these allegations.

IV. Adequacy of the Board's Response.

The mere existence of a grievance procedure and policy against discrimination, coupled with an employee's failure to invoke that procedure, does not necessarily insulate the employer from liability. *Meritor Savings Bank v. Vinson*, 477 U.S. at 71,

106 S.Ct. at 2408. The Board's sexual harassment policy is nevertheless "clearly relevant" to our inquiry into its liability for Plaintiff's alleged sexual harassment. *Id.* First, it raises the issue of credibility. The Board argued that if Ms. Cuesta had truly been harassed, one would expect her to avail herself of the grievance procedure at the time. Second, the Board's effort to address the problem of sexual harassment may be sufficiently genuine to insulate it from liability for a supervisor's harassment. Third, Ms. Cuesta's failure to use the grievance procedure may have increased the harm she suffered, and thereby reduced the Board's liability.

The Board's Employee Manual, page X-2, has the following provisions under the heading "Sexual Harassment":

Sexual harassment is a violation of Title VII of the Civil Rights Acts of 1964, and the Texas Department of Criminal Justice—Pardons and Paroles Division, as an employer, is held responsible for sexual harassment committed by its supervisory personnel, employees and agents, and may also be held responsible, under certain circumstances, for sexual harassment committed by non-employees. All employees will be made aware of this responsibility and understand that conduct of this nature is in violation of Agency policy.

The Manual goes on to define sexual harassment and its penalties, and then gives the following advice under "Assistance":

Any employee who believes that he or she has been discriminated against due to his or her sex should report such incident(s) to one of the following: (1) his or her immediate supervisor; (2) the Agency's Personnel Office or (3) any member of management, to include the Division Director, without fear of reprisal. Sexual harassment allegations will be investigated pursuant to the Agency's Internal Investigation Procedures, which are incorporated herein by reference. Supervisors will ensure that employees under their supervision are familiar with these procedures.

Plaintiff asserted throughout the trial that this grievance procedure was ineffective, and was perceived as such by the employees of the Board. In *Meritor*, the Supreme Court criticized the employer's grievance procedure because it required the employee to report the harassment to her supervisor, who happened to be the one engaging in the sexual misconduct. 477 U.S. at 71, 106 S.Ct. at 2408. The Board's grievance procedure likewise directs the employee to report harassment to the immediate supervisor, or any member of management, on up the chain of command to the Division Director. But unlike the discrimination policy discussed in *Meritor*, the Board's employee manual specifically addressed sexual harassment. The policy also gave the aggrieved employee the avenue of pursuing a complaint in the personnel department, or with any member of management.

In Ms. Cuesta's case, the harasser was the supervisor in charge of the regional office. Ms. Cuesta also perceived Ms. Gonzales, her immediate supervisor, to be in league with Mr. Van Dine so that any complaint to Ms. Gonzales would fall on deaf ears, or result in retaliation. Ms. Cuesta and other employees testified that they did not believe the grievance procedure to provide an effective remedy to their complaints. Although Plaintiff's failure to invoke the grievance procedure works against her constructive discharge claim, it does not insulate the Board from liability. *Meritor*, 477 U.S. at 71, 106 S.Ct. at 2408. Nor does it reflect poorly on her credibility. Soon after resigning, Ms. Cuesta filed her complaints with the EEOC and the Texas Department of Human Rights.

But the Board should be given some credit for making an effort to deal with the problem of sexual harassment. The Board's policy provided that the entire echelon of upper management would be receptive to a sexual harassment complaint. Mr. Brooks testified credibly that he took sexual harassment claims very seriously, and would pursue any matter brought to his attention. We are not prepared to say that Ms. Cuesta was without a receptive audience anywhere in the management of the Board.

Further, the policy allowed the employee to lodge a complaint with the personnel office. The Court heard testimony from Jackie Swartz, who was employed in the Personnel Office. Ms. Swartz related incidents where employee's complaints of sexual harassment were filed with the Personnel Office and were then acted upon. Mike Lozito, a supervisor in the San Antonio I office, also told that he received complaints of sexual harassment by Mr. Van Dine, which were subsequently investigated.

It is not enough, however, for an employer to pay lip service to a sexual harassment policy by setting up a grievance procedure that is ineffective or which the employees regard as an empty promise. Some of Ms. Cuesta's witnesses indicated that they did not trust the Board's grievance procedure. Al Houston, who was Ms. Cuesta's designated trainer (though he had no supervisory authority over her), testified that when Ms. Cuesta complained to him of the harassment, he recommended that she refer to the manual or talk it over with her husband. He said that he stressed to Ms. Cuesta that she had to follow the chain of command.

The Court also heard considerable testimony about an investigation conducted by staff investigator Bill Mulkay. The Director of the Board ordered the investigation after he received a complaint letter sent by one of the employee's lawyers. Mr. Mulkay considered allegations similar to Ms. Cuesta's that Mr. Van Dine had sexually harassed his subordinates. Mr. Mulkay's investigation, however, occurred after Ms. Cuesta left the office and did not consider her complaints. The investigation is therefore not strictly relevant as to the reliability of Ms. Cuesta's claim, but it does give an indication of the presence and effectiveness of the Board's sexual harassment grievance procedure. Mr. Mulkay testified that after receiving his assignment, he interviewed several of the employees in the San Antonio office, and reported that Mr. Van Dine asked inappropriate questions in interviews, but that there was

no sexual harassment. The Board responded to the report by requiring Mr. Van Dine to attend training in avoiding sexual harassment, and to have another person present during the initial interviews, which Mr. Van Dine resented.

The Mulkay Investigation demonstrates that the Board did have a working grievance procedure, but that it was flawed in some respects. Mr. Mulkay interviewed the women over a period of only a couple of days, and almost all of these interviews took place at the office. Although Mr. Mulkay assured the interviewees that their information would be kept confidential, people in the office knew that he was from Austin, and word soon spread that he was investigating Mr. Van Dine. While speed and expense seemed to be a concern for Mr. Mulkay, it is reasonable to assume that the witnesses may have been more forthcoming if they were interviewed in a more neutral setting, and by a third party who was not so identifiable with the chain of command.

The Court is also disturbed that Mr. Mulkay so readily dismissed Aurora Wagar's allegations. Mr. Mulkay felt that Ms. Wagar was just "jumping on a bandwagon," and that "these sorts of comments [regarding fellatio] are so bad that a lady would report it." As with Ms. Cuesta's case, the failure to report does not always indicate that no harassment took place. Mr. Mulkay figures that the natural response of a lady would be to hit Mr. Van Dine with something. Again, the Court cannot condone a requirement of violent retaliation on the part of an employee undergoing harassment, especially when the alleged harasser has a demonstrable advantage in terms of supervisory authority and physical mass.

The Court concludes that the Board did have a working policy against sexual harassment, but that it is unclear whether a timely complaint would have provided a remedy in Ms. Cuesta's case. It is not always easy for a woman to report sexual abuse when the abuser occupies a position of authority over the target. *Meritor*, 477 U.S. at 71, 106 S.Ct. at 2408. And we are not convinced that the Board would have acted swiftly and effectively on her claim. Yet the Board does deserve some consideration for the policy that was in place and its effort to enforce it. If we were to disregard the anti-harassment policy, then employers might see little incentive to develop such a policy, and employees would suffer no penalty for ignoring the grievance procedure in favor of immediate resort to litigation.

## V. Plaintiff's Damages.

■ Ms. Cuesta seeks two years back pay, declaratory judgment, and removal of the "no rehire" status on her file at the Board. The Court will issue a declaratory judgment finding that Ms. Cuesta suffered sexual harassment and a hostile environment. The Court will issue an injunction restraining Mr. Van Dine from engaging in sexual harassment towards Lesha Cuesta. Although Ms. Cuesta no longer works for Mr. Van Dine, this injunction is necessary because she has stated that she might one day seek reemployment at the Board. The Court will also order the Board to remove the "no rehire" status on Ms. Cuesta's file. This "no rehire" designation is routinely placed on an employee's file when they abandon their position. Although the Court has found that Ms. Cuesta was not constructively discharged, such a pejorative designation is inappropriate, and represents a continuing wrong to Ms. Cuesta. Not only does this status unfairly malign Ms. Cuesta in the eyes of anyone who views the file, but also restricts her employment opportunities at the Board, should Ms. Cuesta seek to be rehired there, as she has testified she might.

■ Because there was no constructive discharge, the Court will be unable to award back pay. Title VII only provides for equitable relief in the form of the difference between what plaintiff earned as a consequence of the discrimination and what plaintiff would have earned absent the discrimination. 42 U.S.C. § 2000e–5(g); *Carroll v. General Accident Insurance Co. of America*, 891 F.2d 1174, 1177 (5th Cir. 1990); *Johnson v. Goodyear Tire & Rubber Co.*, 491 F.2d 1364, 1375 (5th Cir.1974).

Here, the discrimination was not the direct cause of Ms. Cuesta's departure from the Board, so this formula is inapplicable. Ms. Cuesta undoubtedly suffered psychological harm as a result of the abuse, but she could recover for such damages only by joining a state law tort claim or some other legal cause of action with the instant claim. The Court will therefore limit Ms. Cuesta's award to nominal damages.

■ The Court deems this to be a positive outcome for the plaintiff, entitling her to recover attorney's fees under 42 U.S.C. § 2000e–5(k) as a prevailing party. *Estate of Farrar v. Cain*, 941 F.2d 1311 (5th Cir. 1991). Plaintiff's attorney is directed to file an affidavit detailing fees expended in this case.

Accordingly, it is hereby ORDERED that Defendant Texas Board of Pardons and Paroles forthwith remove from Plaintiff Lesha Cuesta's personnel file, maintained by said Defendant, the "no rehire" status, or any other negative comments relating to the circumstances of Plaintiff Lesha Cuesta's departure from employment at the Board.

It is further ORDERED that upon Plaintiff Lesha Cuesta's reemployment at the Texas Board of Pardons and Paroles, Defendant Ronald Keith Van Dine shall refrain from further engaging in sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e–2 (1981), towards Plaintiff Lesha Cuesta, and shall refrain from making any sexual overtures toward Plaintiff Lesha Cuesta, now or in the future.

It is further ORDERED that Plaintiff Lesha Cuesta recover from Defendants Texas Board of Pardons and Paroles and Ronald Keith Van Dine nominal damages in the amount of fifty dollars ($50.00).