Deborah A. SIMS

v.

**BROWN & ROOT INDUSTRIAL SERVICES, INC., et al.**

Civ. A. No. 94–0708.

United States District Court, W.D. Louisiana, Shreveport Division.

June 12, 1995.

Nelson W. Cameron, Shreveport, LA, for plaintiff.

S. Price Barker, Cook, Yancey, King & Galloway, P.C., Shreveport, LA, W. Carl Jordan and Suzanne M. Lehman, Vinson & Elkins, Houston, TX, for defendant Brown & Root.

Thomas T. Townsend, Kelly, Townsend & Thomas, Natchitoches, LA, for defendant Frank Brossette.

### MEMORANDUM RULING

STAGG, District Judge.

Deborah Sims ("Sims") has brought a sexual harassment claim under federal and state law against Brown & Root Industrial Services, Inc. ("Brown & Root") and state tort law claims against Frank Brossett ("Brossett"), a former employee of Brown & Root. Brossett has, in turn, filed a third party demand against State Farm Fire & Casualty Company ("State Farm"), seeking coverage for the claims asserted by Sims. Brown & Root, Brossett, and State Farm each filed a motion for summary judgment. For the reasons set forth below, these motions are **GRANTED** and Sims' claims are **DISMISSED WITH PREJUDICE.**

### I. BACKGROUND [1]

#### A. Facts

Brossett was a Project Manager for Brown & Root at the Olin Chemical Plant jobsite in Shreveport, Louisiana, when he interviewed Sims for a job assisting the purchasing agent in purchasing and receiving parts. After the interview, Brossett telephoned Sims at least two times per week for three consecutive weeks. The content of these telephone conversations apparently consisted of Brossett pursuing Sims romantically; he also invited her to have sex with him in exchange for employment. Brossett's comments to Sims on the date of her interview or via telephone include:

(1) that she needed either a "TV daddy" or a "sugar daddy"; and

(2) asking whether she "loved as good as she looked."

Although Sims declined his advances, she was offered a job with Brown & Root. She accepted the position and began work on September 17, 1992. When Sims arrived at work she was shown Brown & Root's policy prohibiting sexual harassment.[2] She did not, however, at that time, complain about Brossett's pre-employment behavior.

Sims was an assistant to Judy Ladner and spent almost no time directly with Brossett. She came into contact with him only when Ladner sent her to get Brossett's lunch order or to get some information from Brossett. Nevertheless, Brossett apparently managed to make unwelcome advances during these brief interludes. The following are some of the alleged acts Brossett made toward Sims once her employment began:

(1) Brossett asked on numerous occasions if he could come to her apartment;

(2) Brossett instructed some employees not to speak to Sims;

(3) Brossett patted Sims on the buttocks;

(4) when Sims asked Brossett what he wanted for lunch, he replied, "you." Sometimes he would mouth, "your body";

(5) Brossett asked Sims if she wanted to borrow money from him—if she would "pay him back";

(6) Brossett called Sims' mother to ask her mother about "very personal matters" regarding Sims;

(7) Brossett stopped by Sims' apartment and talked to Stacy Adams, Sims' apartment manager, and left his business card;

(8) Brossett told Sims on at least two occasions that he found her attractive by commenting that she looked good in her pants;

(9) Brossett instructed Sims to go to a motel; and

(10) Brossett reduced Sims' pay from $10.00 to $8.00 per hour for her failure to submit to his request for sexual favors.

Sims continued to work at her reduced rate of pay for approximately one month. Then, in the last week of February, Sims complained of Brossett's conduct, utilizing Brown & Root's sexual harassment policy. This policy provides, in pertinent part:

---

1. For the purposes of this Memorandum Ruling only, the court will assume that Sims' deposition testimony relating to her Title VII claim is true.

2. Sims admits that on her first day of employment, Tracy Hood, the office manager, told Sims that Brown & Root had a policy prohibiting sexual harassment; Hood also showed Sims the policy. Additionally, Sims knew that the policy was posted on a bulletin board outside of the trailer office in which she worked.

If you believe you are being discriminated against you should implement the Open Door Complaint Policy by first discussing the matter with your immediate supervisor. If you are not satisfied with the response from using the chain of command, you should address your concern with the Project EEO Officer. If the problem is not resolved at that level, you should advise your Business Unit Personnel Manager and/or the Employee Relations/Compliance Department in Houston [the telephone number was inserted here]. Although we encourage you to resolve complaints using the chain of command, the Open Door Policy allows you to address problems to any level of supervision.

Deposition of Deborah Sims, at Exhibit 4 (December 20, 1994) (attached to Brown & Root Memo. Supp. Summ. J.).

Sims made her complaint to a supervisor, Tracy Hood, who immediately placed a call to Greg Conklin at the Human Resources Department at the company's main offices in Houston, Texas. The same day, Conklin called Sims at her home and listened to her complaints. He told her that Brown & Root would investigate her claims, pay back any lost money if necessary, and that she should let him know immediately if anything else happened. True to his word, the following week, the first week of March, a representative from the Human Resources Department, Ralph Morales, went to the jobsite to investigate Sims' claim. Morales interviewed several Brown & Root employees, including Sims and Brossett. As a result of Morales' investigation, Brown & Root concluded that "[t]here is an abundance of testimony regarding the conduct of . . . Brossett which makes a very strong case for quid pro quo type sexual harassment. Although Frank denies it, there are just too many people saying the same things about him." Brossett was terminated on March 10, 1993, the second week of March, for violation of Brown & Root's sexual harassment policy.

Additionally, Sims was reinstated to her previous wage scale and paid her unpaid past wages. After Brossett's termination, however, Sims claims that she began to feel "awkward" because of the behavior of two of Brossett's relatives who were still working at the jobsite. Without making any further complaints to Brown & Root, she resigned on May 19, 1993.

### B. Sims' Legal Claims

Sims claims that Brown & Root is liable for sexual harassment pursuant to Title VII and La.R.S. § 51:2231. She claims that a hostile work environment existed at Brown & Root; and that Brossett's pre-employment conduct offering employment for sex and his decision to reduce her pay once it became clear to him that she would not have sex with him was *quid pro quo* sexual harassment.

Sims also claims that Brossett is liable for the state law torts of battery and intentional infliction of emotional distress. The battery allegedly occurred when Brossett patted Sims on the buttocks and when he "hugged" her neck. The intentional infliction of emotional distress tort allegedly occurred when Brossett called Sims' mother to ask personal questions about Sims' sex life; when Brossett propositioned Sims; when Brossett reduced Sims' wages because she would not engage in sex with him; when Brossett called Sims' apartment manager to meet with Sims; and when Brossett appeared at Sims' apartment at approximately 3:00 A.M. to 4:00 A.M. on two separate occasions. Sims claims that Brown & Root is liable for both of these torts under the theory of respondeat superior.

Finally, Sims claims that she was constructively discharged from her job. She argues that Brossett's behavior and the "attitude" of two other Brown & Root employees, who are also Brossett's relatives, caused her to resign from her position.

### II. SUMMARY JUDGMENT STANDARD

Under Fed.R.Civ.P. 56(c), a summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The court must "review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v.*

*State Farm Mut. Auto Ins. Co.,* 784 F.2d 577, 578 (5th Cir.1986).

■■■ The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion, and identifying those parts of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party need not produce evidence negating the existence of a material fact, but need only point out the absence of evidence supporting the nonmoving party's case. *Id.* at 325, 106 S.Ct. at 2554; *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1195 (5th Cir.1986). If the moving party carries his initial burden, the burden then falls upon the nonmoving party to demonstrate the existence of a genuine issue of a material fact. This showing requires more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 584–88, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Id.; see Boeing Company v. Shipman,* 411 F.2d 365, 374–75 (5th Cir.1969) (*en banc*). While the party opposing the motion may use proof filed by the movant to satisfy his burden, "only evidence—not argument, not facts in the complaint—will satisfy" the burden. *Solo Serve Corp. v. Westowne Assoc.,* 929 F.2d 160, 164 (5th Cir.1991). "Unsworn pleadings, memoranda or the like are not, of course, competent summary judgment evidence." *Larry v. White,* 929 F.2d 206, 211 n. 12 (5th Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 1946, 123 L.Ed.2d 651 (1993).

■■■ Where the moving party bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. *International Shortstop, Inc. v. Rally's, Inc.,* 939 F.2d 1257 (5th Cir.

1991), *cert. denied,* 502 U.S. 1059, 112 S.Ct. 936, 117 L.Ed.2d 107 (1992). The nonmovant may defeat the motion by showing a genuine dispute of material fact or by showing that the moving party's evidence is so transparent that it may not persuade the reasonable factfinder to return a verdict in favor of the moving party. *Id.* "Summary judgment is appropriate where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, or where it is so overwhelming that it mandates judgment in favor of the movant." *Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993).

## III. ANALYSIS

### A. Title VII [3]

#### 1. Legal standard

■■■ Whether making out a claim for hostile work environment or *quid pro quo* type sexual harassment, a plaintiff must prove that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Jones v. Flagship Int'l,* 793 F.2d 714, 719–722 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Failure to raise a genuine issue of material fact as to this element will result in dismissal of a plaintiff's claim on summary judgment. *Nash v. Electrospace System, Inc.,* 9 F.3d 401 (5th Cir.1993). Because failure to take prompt remedial action is crucial to Sims' success, the absence of a genuine issue of fact on that subject will be decisive.

#### 2. Prompt remedial action

##### a. Brown & Root's arguments

Brown & Root asserts that it had no knowledge of Brossett's behavior until Sims actually complained. Further, upon learning of Brossett's actions toward Sims, it took prompt remedial action to correct the problem. Thus, it argues that precedent and policy dictate that its corrective actions negate liability under Title VII. Citing *Car-*

---

**3.** Sims also claims that Brown & Root violated Louisiana's sexual harassment law. La.R.S. 51:2231. This statutory scheme is a "mirror image" of Title VII. *See Fishel v. Farley,* 1994 WL 90325 (E.D.La.1994); *see also Bennett v.* *Corroon & Black Corp.,* 517 So.2d 1245 (La.App. 4th Cir.1987), *writ denied,* 520 So.2d 425 (La. 1988). Thus, in addressing Sims' Title VII claim, this court is also deciding Sims' state law sexual harassment allegation.

**926**

*mon v. Lubrizol Corp.*, 17 F.3d 791, 795 (5th Cir.1994) ("overwhelming evidence of the prompt and proper responses by Lubrizol" negated employer's liability under Title VII); *Nash*, 9 F.3d at 404 (5th Cir.1993) (employer who undertook immediate investigation and transferred plaintiff to another department with no loss of pay or benefits, all within one week of plaintiff's initial complaint, took proper remedial action and was thus not liable under Title VII); *see also Garcia v. Elf Atochem North America*, 28 F.3d 446, 451 (5th Cir.1994) (employer was not liable under Title VII because he immediately reprimanded the harasser, gave stern warning, and effectively ended any further harassment); *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 310 (5th Cir.1987); *cf. Cortes v. Maxus Exploration Company*, 977 F.2d 195, 199 (5th Cir.1992) (employer did not take any remedial measures to protect the plaintiff); *Waltman v. International Paper Co.*, 875 F.2d 468, 481 (5th Cir.1989) (reversal of summary judgment where there was some question whether the employer's remedial action, namely, requiring the supervisors to read its sexual harassment policy to their crews, was sufficient).

### b. Sims' arguments

Sims remonstrates with two different arguments. First, Sims apparently asserts that the prompt remedial action element is inapplicable; she argues that the cases cited by Brown & Root are distinguishable on the grounds that the present case involves a supervisor, rather than a co-worker, who controlled the plaintiff's terms and conditions of employment. The necessary implication flowing from this argument, which the court will initially dispel, is that Brown & Root is strictly liable for the acts of its supervisors. Second, Sims claims that a hostile work environment existed, even before the incidents between Brossett and Sims, which was so pervasive that Brown & Root either knew or should have known about it and taken measures earlier.

### c. Title VII is not a strict liability statute

Sims' first argument, although drawing a somewhat interesting distinction upon first glance, is, upon closer examination, dubious at best, and severely misleading to the court at worst. In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court left open the question of when an employer is liable for sexual harassment due to the acts of its employee. It made clear, however, that two distinct caveats were to be followed by the lower courts: (1) there are some limits on the acts of employees for which employers will be held responsible under Title VII and thus employers are not always automatically liable for acts of their supervisors; and (2) absence of notice to an employer does not necessarily insulate that employer from liability. *Id.* at 72, 106 S.Ct. at 2408.

Fifth Circuit jurisprudence is consistent with the Supreme Court's cautionary instruction. That is, employers may be held liable for the acts of their agents. *See Grant v. Lone Star Co.*, 21 F.3d 649 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 574, 130 L.Ed.2d 491 (1994); *see also* 42 U.S.C. § 2000e(b). Employers may escape liability, however, if, upon learning of the illicit behavior of the agent, prompt remedial action is taken. *Carmon*, 17 F.3d at 795; *Nash*, 9 F.3d at 404–405. Furthermore, it is the plaintiff's burden to prove that the employer failed to take prompt remedial action after notice. *Id.*

Sims misapprehends the nature of this analysis to be that an employer is *always* liable for the acts of its agents, when, in fact, it is correct to state that agency theory is only a mechanism—showing employer knowledge—which opens the door to employer liability. This door will quickly shut if the plaintiff cannot prove that the employer also failed to take prompt remedial action. This conclusion is based upon a common sense interpretation of the Fifth Circuit's recitation of the fifth element of a sexual harassment claim:

[T]he employer knew or should have known of the harassment in question *and* failed to take prompt remedial action.

*Jones*, 793 F.2d at 719–720 (emphasis added). Thus, the conjunctive "and" makes certain that even if Sims is able to prove employer knowledge, such as the knowledge of Brown

& Root through its agents, it must also prove that Brown & Root failed to take prompt remedial action.

### d. Prompt remedial action element is applicable

■ Reviewing Sims' argument, she cites the following language from *Nash* in support of her argument that the prompt remedial action element is inapplicable when a supervisor, as opposed to a co-worker, sexually harasses an employee:

> As the offender in [the Supreme Court case of] *Harris* [*v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)] was the company president, the issue of respondeat superior liability never arose. This case poses a more typical situation, in which the alleged offender, though in some ways a direct supervisor of Nash's work, was not responsible for the terms and conditions of her employment, for her work assignment within the company, or for hiring or firing decisions. The summary judgment record does not establish that anyone within the company hierarchy was aware of Nash's complaints against Sharp until she went to the personnel department on February 22, 1991. The record also contains no evidence that Sharp's conduct took place in public, under the eye of co-workers or supervisors. it thus appears that the company did not know nor should it have known of Sharp's offensive inquisitiveness about Nash until she complained to those with authority to address the problem.

*Nash,* 9 F.3d at 404. Sims' interpretation of this language is

> that the Court drew an implicit distinction here between those supervisors who have no control over the terms and conditions of employment (i.e., those who can hire, fire or give pay raises, etc) and those supervisors like BROSSETT who do have control over the victim's terms and conditions of employment.

Sims' Mem.Oppos.Summ.J., at 21–22.

In other words, Sims is arguing that in the circumstance that a supervisor is the harasser, the prompt remedial action element does not apply and the employer is thus strictly liable. *Nash* does not say so much as Sims would have the court believe. In fact, the court in *Nash* noted, immediately preceding the language cited by Sims, that:

> *Harris* does not, however, support the proposition that in all such cases, an employer will be held liable for a violation of Title VII. An employer becomes liable for sexual harassment only if it knew or should have known of the harassment and failed to take prompt remedial action.

*Nash,* 9 F.3d at 404. Thus, the Fifth Circuit has taken the position that Title VII is not a strict liability statute. Moreover, the jurisprudence shows that the prompt remedial action element has been applied even when supervisors were the alleged harassers. *See Garcia,* 28 F.3d at 448 (plant foreman was the alleged harasser); *Cortes,* 977 F.2d at 197 (immediate supervisor was the alleged harasser); *Waltman,* 875 F.2d at 479 (supervisor was the alleged harasser); *Jones,* 793 F.2d at 716 (Vice–President in charge of Personnel was the alleged harasser); *Fishel v. Farley,* 1994 WL 90325 n. 32 (E.D.La. 1994) (immediate supervisor was the alleged harasser; the court found that supervisors are subject to the respondeat superior element); *Cuesta v. Texas Department of Criminal Justice,* 805 F.Supp. 451, 453 (W.D.Texas 1991) (Regional Supervisor was the alleged harasser); *but see Ross v. Double Diamond, Inc.,* 672 F.Supp. 261, 274 (N.D.Texas 1987) (sexual harassment committed by a supervisor was imputed to the employer under strict liability theory). Once again, this is consistent with the Supreme Court's teachings in *Meritor Savings Bank, FSB,* which, it must be remembered, cautioned that employers are not "always automatically liable for sexual harassment by their supervisors." *Meritor Savings Bank, FSB,* 477 U.S. at 72, 106 S.Ct. at 2408.

### e. Sims' counsel has misled the court

Next, it appears that Sims' counsel deceptively attempted to mislead the court into believing that the Supreme Court has set forth a strict liability standard in cases where the supervisor is the harasser. To wit, in her brief Sims quotes the following language

from *Meritor Savings Bank, FSB* as authoritative:

> [W]here a supervisor exercises the authority actually delegated to him by his employer, by making or threatening to make decisions affecting the employment status of his subordinates, such actions are properly imputed to the employer whose delegation of authority empowered the supervisor to undertake them.

Sims' Mem.Oppos.Summ.J., at 17 (quoting *Meritor Savings Bank, FSB,* 477 U.S. at 70, 106 S.Ct. at 2407). Incredibly, the quoted language is not the view taken by the Supreme Court, but merely a statement of the position taken by one of the litigants—which, importantly, was not adopted by the Supreme Court, but was, in fact, rejected. *Meritor Savings Bank, FSB,* 477 U.S. at 70–72, 106 S.Ct. at 2407–2408 ("we hold that the Court of Appeals erred in concluding that employers are always automatically liable for sexual harassment by their supervisors"). The court, try as it might, is unable to comprehend how this could have been inadvertently inserted by plaintiff's counsel—absent extreme neglect—in light of the fact that the sentence and paragraph began with obvious references to the EEOC's amicus curiae brief. The court would admonish plaintiff's counsel at this point, but unfortunately the story is not quite at its end.

Additionally, Sims cites and quotes *Vinson v. Taylor,* 753 F.2d 141 (D.C.Cir.1985), *aff'd sub nom, Meritor Savings Bank, FSB,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), for the proposition that "if the creator of the hostile work environment is a supervisor, then the employer need not receive any notice." Sims' Mem.Oppos.Summ.J., at 18. Although *Vinson* was affirmed by the Supreme Court in *Meritor Savings Bank, FSB,* the Court, as discussed above, explicitly rejected the very same notion. *Meritor Savings Bank, FSB,* 477 U.S. at 70–72, 106 S.Ct. at 2407–08.

Finally, a group of Fifth Circuit cases dealing with Title VII racial discrimination were cited by Sims in support of her strict liability argument. Sims' Mem.Oppos.Summ.J., at 2 n.1. This was the wrong line of cases to cite in litigation involving sexual harassment, which has itself an entire large body of jurisprudence.[4]

### f. Application of law to facts

■ Having decided that the prompt remedial action element is applicable, the court must next determine whether a genuine issue of material fact has been presented. Upon receiving notice of Sims' complaint in late February of 1993, the Human Resources Department of Brown & Root moved with commendable rapidity. On the day of Sims' complaint, Greg Conklin phoned Sims from his office in Houston. He listened to her allegations, assured her that he would thoroughly investigate her claims, that she would be paid back for any lost wages if her claims were true, and that she should let him know if anything further happened between her and Brossett. The following week another Human Resources representative, Ralph Morales, visited the jobsite to investigate Sims' claims. Morales interviewed Sims, Brossett, and other Brown & Root employees. When Morales spoke with Sims, he told her to let him know if anything further occurred during the pendency of the investigation.

During the investigation, Brossett requested that Sims perform a job task; Sims reported this to her immediate supervisors, Judy Ladner and Tracy Hood. Hood told Brossett that he was not to be alone with Sims and that Brossett should go through Hood if he needed any tasks done. Sims had no further contact with Brossett.

On March 10, 1993, approximately two weeks subsequent to Sims' complaint and four or five days after the conclusion of Morales' investigation, Brossett was terminated for violation of Brown & Root's sexual harassment policy. Sims was then restored to the position she had occupied previously, making $10 per hour. She also received, in full, the backpay of which she had been deprived since her demotion to $8 per hour.

---

**4.** The court also notes with irritation that plaintiff's counsel even failed to announce the proper summary judgment standard. Instead of referring mostly to the Supreme Court's trilogy of cases dealing with this subject, many older cases, some not even within this Circuit, were cited as authoritative. *See* Sims' Mem.Oppos.Summ.J., at 3–6.

Incidentally, for its actions, Brown & Root subsequently defended against an unsuccessful defamation suit brought by Brossett.

Sims has been unable to direct the court to any evidence contradicting the fact that Brown & Root took the aforementioned actions upon receiving Sims' complaint to the Human Resources Department. Rather, it is clear that Brown & Root

> took the allegations seriously, it conducted prompt and thorough investigations, and it immediately implemented remedial and disciplinary measures based on the results of such investigation. Holding a company such as [Brown & Root] liable after it has taken such action would produce truly perverse incentives benefitting no one, least of all actual or potential victims of sexual harassment.

*Carmon*, 17 F.3d at 795–796. Moreover, it is apparent that Brown & Root's sexual harassment policy, which provides a clear avenue for all abused employees by way of its Open Door Complaint Policy and hotline telephone number, actually worked in this case and should therefore be praised and celebrated as a model of efficiency. Thus, in accordance with *Nash* and *Carmon*, Sims is apparently unable to make out a necessary element of her claim under Title VII.

### g. Lack of knowledge of Brossett's prior conduct

The inquiry does not end here, however, because Sims argues that the prior acts of Brossett would tend to prove that Brown & Root knew or should have known of Brossett's behavior at a much earlier date and failed to take prompt remedial action at that point. Specifically, Sims alleges that at the UOP jobsite,[5] approximately one to two months before Sims was hired at the Olin jobsite and seven to eight months before Brossett was fired, Brossett acted similarly toward Lisa Acklin, Rose Coleman, and Judy Fife, female employees of Brown & Root. This group of acts is purportedly being offered not as character evidence, but to prove

(1) that certain supervisors had notice of Brossett's behavior at this time; and (2) that Brossett's behavior was so pervasive that Brown & Root should have known about it. For the purpose of this Memorandum Ruling, the court will assume that this evidence is admissible under F.R.E. 404(b).

Harry Vonsenden was the foreman of the pipe department at the UOP jobsite. He was sometimes able to hire, usually able to fire, and always able to discipline employees. In his deposition testimony, Vonsenden states that although he never spoke to Rose Coleman, Lisa Acklin, or Judy Fife directly concerning Brossett's conduct toward them, he had heard rumors from other employees that Brossett had hit on them or asked them out. Deposition of Harry Vonsenden, at p. 10–14 (February 24, 1995).

Howard Beatty was an electrical crew foreman at the UOP jobsite. He had the ability, albeit somewhat limited, to hire, fire, and discipline employees. Deposition of Howard Beatty, at p. 42 (February 24, 1995). In his deposition testimony, Beatty states that Lisa Acklin told him that Brossett had asked her on several occasions to go to bed with him. *Id.* at p. 9. Also, Acklin said that Brossett told her it would be "worth her while." *Id.* at p. 10. Finally, Beatty states that supervisory personnel, namely foremen, knew about Brossett's pattern of attempting to have sexual relations with female employees. *Id.* at p. 23.

Carol Vonsenden was an electrical helper at the UOP jobsite; she married Harry Vonsenden just before the UOP job ended. She was not a supervisor, but simply an employee. In her deposition, she states that Rose Coleman told her that Brossett had asked Coleman out "two or three times" and that Coleman "just always laughed about it." Deposition of Carol Vonsenden, at p. 9 (February 24, 1995). Also, Judy Fife told her that Brossett had asked Fife to a motel "more than once," but "it didn't seem to bother" Fife; rather, Fife would "always kind of

---

5. The UOP jobsite refers to a project in Blanchard, Louisiana that Brown & Root had undertaken prior to the subject matter of this suit. Brossett allegedly committed acts of sexual harassment at this prior jobsite, also. The claimed

relevance of his prior acts is that Brown & Root knew or should have known of Brossett's behavior well before Sims' complaint and should therefore have taken remedial action much sooner.

laugh about it ... [m]ore like it was a joke...." *Id.* at p. 12–13. Lisa Acklin, however, never mentioned Brossett's alleged behavior to Mrs. Vonsenden. She further states that she told Mr. Vonsenden this information. *Id.* at p. 13–14.

Judy Fife was an office cleaner at the UOP jobsite. She states that on three occasions Brossett indicated that she was a smart woman who could go far in the company if she slept with him. Deposition of Judy Fife, at p. 10–11 (February 24, 1995). On these occasions, Brossett asked her to go to a motel, dinner, or the movies. *Id.* at p. 12–13. She found some of this conduct to be "offensive." *Id.* She told Carol Vonsenden and an unidentified tool room supervisor about these incidents. *Id.* at p. 11.

Although the court obviously does not condone the alleged actions of Brossett, it concludes as a matter of law that Brown & Root did not have knowledge of his conduct. The only supervisors who had heard "rumors" of Brossett's conduct were Harry Vonsenden, a low-level tool foreman, and Howard Beatty, a low-level electrical crew foreman. There is a notable absence of evidence, however, that a higher level supervisor or immediate supervisor had knowledge of Brossett's alleged conduct. Thus, the court will not impute Vonsenden or Beatty's knowledge of what each describes as "rumors" to Brown & Root.

As for Brossett's knowledge of his own conduct, it is possible that this could provide notice to Brown & Root through agency principles. The effect of this decision, however, would result in employers being held strictly liable in many typical situations; and the Fifth Circuit, as discussed above, has made clear that Title VII is not a strict liability statute. *Nash,* 9 F.3d at 404. For example, if a victim does not report harassment at all—as was the case with the women at the UOP jobsite—or waits for a lengthy period of time before reporting, the employer will never have an opportunity to engage in prompt remedial action and will thus be liable.

This would result not only in *de facto* strict liability for employers, but would encourage both the victim and the supervisor to be silent. That is, the victim's silence would be beneficial to her Title VII claim because it would severely limit the employer's opportunity to take *prompt* remedial action. Of course, the supervisor who engages in illicit conduct is unlikely to report himself. This would, in turn, curtail the use of sexual harassment policies to aid thoughtful employees in rectifying the situation. Thus, the court will not impute Brossett's knowledge of his own alleged conduct to Brown & Root.

■ The discussion above concerned whether Brown & Root had actual knowledge of Brossett's prior conduct; the focus now shifts to whether Brown & Root had constructive knowledge. For Sims to prove that Brown & Root had constructive knowledge, she must show that a hostile work environment existed which was so pervasive that Brown & Root should have known about it. *Waltman,* 875 F.2d at 478; *Cuesta,* 805 F.Supp. at 455. No reasonable juror could find in favor of Sims on this issue. With the exception of one of Brossett's exchanges with Judy Fife, none of the alleged conduct nearly rises to the level of sexual harassment. Much of the evidence consists of Brossett asking female employees out on dates, albeit in a forward manner. Furthermore, no evidence has been presented that Rose Coleman or Lisa Acklin were in the slightest bit offended by Brossett's conduct. In fact, at least Coleman laughed about Brossett's conduct; also, although there is contradictory evidence, Fife also thought Brossett's conduct was laughable, "like it was a joke." Although Fife testifies that she was at least somewhat offended, this is simply insufficient for one to draw the conclusion that sexual harassment was so pervasive in the workplace that Brown & Root should have known about it.

## 3. Conclusion

When an employee complains that she has been sexually harassed, the employer must sail safely between Scylla and Charybdis as it faces the unenviable task of taking appropriate, lawful action toward both the alleged victim and the alleged wrongdoer. Indeed, Brown & Root's course has been perilous: Brossett brought a defamation suit against it

subsequent to his termination and, obviously, Sims has brought suit in the present case. Nevertheless, Brown & Root acted as a responsible, exemplary employer by processing Sims' complaint swiftly, seriously, and, upon gathering the evidence in a thorough manner, decisively and justly. Sims was placed back in her original position, given lost backpay, and Brossett was terminated. Thus, the court has no difficulty concluding that Sims has failed to prove an essential element of her claim, that Brown & Root failed to take prompt remedial action upon receiving notice of Brossett's conduct.

Furthermore, the court holds that Sims has failed to raise a genuine issue of material fact whether Brown & Root had knowledge of Brossett's prior conduct at the UOP jobsite and failed to take prompt remedial action at that point. Therefore, Sims' Title VII claims are dismissed.

## B. Constructive Discharge

■ To prevail on her constructive discharge claim, Sims must prove that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65 (5th Cir.1980); *see also Cortes*, 977 F.2d at 200; *Landgraf v. USI Film Products*, 968 F.2d 427, 430 (5th Cir. 1992), *aff'd*, —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1993). Furthermore, she must "demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Landgraf*, 968 F.2d at 430.

■ The evidence, and lack thereof, compels the court to rule against Sims on this issue. Sims resigned on May 19, 1994, seventy days after Brown & Root terminated Brossett. Greg Conklin and Ralph Morales both made certain that Sims knew she should contact them if she had any further problems. Yet, Sims never complained. Sims admits that she had other employment lined up at the time of her resignation; there is evidence that this is the reason she left. Finally, and most importantly, Sims is unable to present any credible evidence that conditions were so intolerable that she was forced to resign. Rather, she can only state that she felt "awkward" due to the "attitude" of two Brown & Root employees—who are also Brossett's relatives—toward her following Brossett's termination. Therefore, the court concludes that Sims has presented insufficient evidence to create a genuine issue of material fact. *See Ugalde v. W.A. McKenzie Asphalt Co.*, 990 F.2d 239, 243 (5th Cir.1993) (no genuine issue of material fact created where the only evidence of discriminatory conduct was that the supervisor referred to Hispanic workers as "wetbacks" and "Mexicans").

## C. State Law Tort Claims

Sims claims that Brossett committed the intentional torts of battery and intentional infliction of emotional distress. As pointed out by Brossett and Brown & Root in their briefs, however, these claims have prescribed. La.Civ.Code art. 3492 provides in pertinent part:

> Delictual actions are subject to a liberative prescription of one year. This prescription commences to run from the day injury or damage is sustained.

The present suit was filed on April 15, 1994. All of the acts Brossett allegedly committed toward Sims occurred during Brossett's employment with Brown & Root. Brossett was terminated on March 10, 1993, more than a year prior to the filing of Sims' suit.

■ In response to the defendants' motions for summary judgment on the prescription issue, Sims manages only this comment:

> Since the damage caused by BROSSETT did not cease after his discharge, then SIMS ought to be allowed a tolling of the prescriptive period until the date she left her employment which would be within the one year period.

Rec.Doc. 62, at p. 2 (citing *Waltman*, 875 F.2d at 476). Sims once again misstates the law. As pointed out by the Fifth Circuit in *Waltman* itself:

> The Louisiana Supreme Court has recognized an equitable exception to [the] prescription period, holding that "when the tortious conduct and resulting damages continue, prescription does not begin until

the *conduct* causing the damage is abated.... Where the cause of the injury is a continuous one giving rise to successive damages, prescription dates from the cessation of the wrongful *conduct* causing the damage."

*Waltman,* 875 F.2d at 476 (quoting *South Central Bell Telephone v. Texaco, Inc.,* 418 So.2d 531, 533 (La.1982)) (emphasis added). Thus, courts should look to the date the conduct abates, and not, as Sims suggests, to the date the damage abates.

As mentioned above, Sims has failed to present any evidence that Brossett engaged in any tortious conduct following his termination from Brown & Root. Therefore, the state law claims asserted by Sims against Brossett and Brown & Root as his employer are dismissed. Accordingly, Brossett's third party complaint against State Farm is also dismissed.

An order consistent with the terms of this Memorandum Ruling was previously issued on April 10, 1995. Rec.Doc. 68.