**James E. GRANT, Jr.**

v.

**UOP, INC. and Claude Clary.**

**Civil Action No. 95–1240.**

United States District Court,
W.D. Louisiana,
Shreveport Division.

Oct. 4, 1996.

Allison Anne Jones, John S. Hodge, Shreveport, LA, for Plaintiff.

Edwin H. Byrd, III, John T. Cox, Jr., J. David Garrett, Blanchard, Walker, O'Quin & Roberts, Shreveport, LA, for Defendant UOP.

Joel M. Sermons, Shreveport, LA, for Defendant Claude Clary.

## MEMORANDUM RULING

STAGG, Senior District Judge.

Before the court is UOP, Inc.'s ("UOP") motion for summary judgment, Claude Clary's ("Clary") motion for summary judgment, and James E. Grant, Jr.'s ("Grant") motion for partial summary judgment. Based on the following, UOP's motion for summary judgment is GRANTED; Clary's motion for summary judgment is GRANTED; and Grant's motion for summary judgment is DENIED. Grant's claims against UOP and Clary are to be DISMISSED WITH PREJUDICE.

## I. FACTS

Grant began working at UOP in June of 1992. He was hired by Harlan M. Phelps ("Phelps"), UOP's Human Resource Manager, and was assigned to the labor department. Clary had been on sick leave when Grant was hired and became Grant's supervisor upon his return in September of 1992.

Grant claims that during a conversation with Clary in September of 1992, Clary used the expression "cotton patch niggers" when referring to the wearing of apparel of two other employees. In response, Grant told Clary he did not appreciate the comment. *See* Grant deposition Vol. I at 172. In September of 1992, Clary required Grant to use a gas powered grass trimmer around a pond on UOP property for approximately two weeks. Grant requested to do another job, but Clary told him everyone else was busy and that he did not want to interrupt their work by trying to switch out jobs. *See* Grant deposition Vol. I at 171. At some point before December 1993, Grant was required to use a "swing blade" to cut grass. In 1992 or 1993 Grant was required by Clary to dig a 16 foot deep hole with a white co-worker using shovels. The job was eventually finished by using a "backhoe." *See* Grant deposition Vol. I at 185, 190.

On April 15, 1994, Grant was admitted to CPC Brentwood Hospital for psychiatric treatment. He returned to work on May 23, 1994. On April 11, 1995, Grant made a written complaint to Vernon Chance, Plant Manager, regarding three alleged instances of racial discrimination. They are listed as follows: 1) On March 30, 1995, Grant accused Larry Bell ("Bell"), a co-worker who had no supervisory authority over Grant, of saying "niggers can't weld" and the phrase "nigger please" in Grant's presence. Bell admitted saying "nigger please," but denied saying "niggers can't weld"; 2) Grant claimed that on April 3, 1995, Jimmy Don Blaine ("Blaine"), also a co-worker of Grant's, said to Grant regarding a karate match in which Grant was participating, that Grant's opponent probably was thinking to himself that "this damned nigger is gonna whip my ass." Blaine denied making the statement; 3) On April 11, 1995, Clary asked Grant if he knew the difference between a "nigger" and a "black man." Clary admitted saying this and attempted an apology the next day. At the time this statement was made Clary was not Grant's supervisor, nor was he working with Grant at UOP.

On May 16, 1995, Phelps was made aware of additional claims by Grant that were not made to UOP on April 11, 1995. Many of these claims were alleged against Clary. On May 19, 1995, Clary was suspended until his forced retirement on May 31, 1995.

Grant also makes a claim for retaliatory discipline and failure to promote. Facts relevant to these claims are listed as follows: 1) On March 11, 1994, Grant was given an oral warning by W.B. Gasway for absenteeism; 2) He was also given an oral warning for absenteeism on September 28, 1994; 3) He was given a written warning on November 23, 1994; 4) When cited again for an unacceptable absenteeism rate for the period of January 15, 1995, through April 15, 1995, this culminated in a three day suspension for Grant starting on April 18, 1995.

Grant filed a claim with the Louisiana Human Rights Commission on April 18, 1995. He filed a claim with the EEOC on April 20, 1995. This suit was filed on July 7, 1995. Grant makes claims against UOP for violations of Title VII, 42 U.S.C. § 2000e *et seq.*, 42 U.S.C. § 1981, violations of La R.S. 23:1006 and 51:2256, and a claim for inten-

tional infliction of emotional distress. Grant makes the same claims against Clary individually with the exception of the Section 1981 claim which Grant concedes he does not have against Clary. *See* Grant's Memorandum in Opposition to Summary Judgment at 19.

## II. LAW AND ANALYSIS

### A. Summary Judgment Standard

Summary judgment is proper pursuant to F.R.C.P. 56 "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish an essential element of that party's case, and on which that party will bear the burden of proof at trial." *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995). If the movant demonstrates the absence of a genuine issue of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Id.* Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. *Armstrong v. City of Dallas,* 997 F.2d 62, 67 (5th Cir.1993).

### B. Title VII Hostile Work Environment Claims

▆ Title VII makes it unlawful "for an employer ... to discriminate against an individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The phrase "terms, condi-

tions, or privileges of employment" has been interpreted by the courts to provide a cause of action to a person who works in a discriminatorily hostile environment. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 20, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993); *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972).[1]

According to the Court in *Harris,* a discriminatorily hostile workplace is one which is

> permeated with "discriminatory intimidation, ridicule, and insult," that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,"....

*Harris,* 510 U.S. at 21, 114 S.Ct. at 370, *quoting Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65–67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (citations omitted). This standard does not make actionable

> any conduct that is merely offensive.... As we pointed out in *Meritor,* "mere utterance of an ... epithet which engenders offensive feelings in a[n] employee" does not sufficiently affect the conditions of employment to implicate Title VII. Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.

*Id.*

Grant cites *Brown v. East Mississippi Elec. Power Ass'n,* 989 F.2d 858 (5th Cir. 1993), and cases from other circuits, for the proposition that the use of the term "nigger", or racial epithets containing that term, are essentially discrimination *per se* and should always amount to a hostile work environment under Title VII. *Brown* does not hold that use of this term constitutes a hostile work environment *per se.* *Brown* holds that use of this term is sufficient to shift the burden to the employer under the burden shifting anal-

---

1. The Louisiana statutes regarding racial discrimination are similar in scope to the antidiscrimination prohibitions of Title VII. Thus, in addressing Grant's Title VII claims, this court is also deciding Grant's state law discrimination claims. *See Sims v. Brown & Root Indus. Services, Inc.,* 889 F.Supp. 920, 925 n. 3 (W.D.La. 1995) (Stagg, J.), *affirmed,* 78 F.3d 581 (5th Cir.1996).

ysis of *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).

In *Vaughn v. Pool Offshore Company*, 683 F.2d 922 (5th Cir.1982), the Fifth Circuit did not find a hostile work environment in an employment situation where Vaughn was called "nigger," "coon," and "black boy" by co-workers. Additionally, co-workers used the word "nigger" in Vaughn's presence on two other occasions. The court found that Vaughn also used racial slurs along with his co-employees and that all persons on this particular offshore oil rig were subjected to the same "obnoxious treatment." *Id.* at 925. The cases cited above clearly do not establish that the law of the Fifth Circuit dictates that the occasional use of this opprobrious epithet in an employment setting equates to a hostile work environment *per se.*

The incidents of alleged discrimination relevant to the hostile environment determination are those involving Larry Bell, Jimmy Don Blaine, and Claude Clary.[2] Based on the totality of the circumstances, these incidents, though not acceptable in modern society and obviously offensive to Grant, could not lead a reasonable juror to conclude that Grant has met the *Harris* standard of hostile work environment. Grant's work environment was not *permeated* with discriminatory insult and intimidation. This conduct was not *pervasive* so as to create an objectively hostile work environment. These were isolated events perpetrated by different people. The work environment of Grant was not replete with racial slurs, but rather on these isolated occasions this term was used and it surely "engendered offensive feelings" in Grant. *See Harris*, 510 U.S. at 21, 114 S.Ct. at 370.

### C. Prompt Remedial Action Under Title VII

■ Even if the above conduct could be said to establish a hostile work environment for Grant, UOP took prompt remedial action "reasonably calculated" to end the harassment in question. *Garcia v. Elf Atochem*

*North America*, 28 F.3d 446, 451 (5th Cir. 1994). What is appropriate remedial action will necessarily depend on the particular facts of the case—the severity and persistence of the harassment, and the effectiveness of any remedial steps. *Id., citing Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir.1989). Title VII does not require that an employer use the most serious sanction available to punish an offender, particularly where, as here, this was the first documented offense by an individual employee. *Landgraf v. USI Film Products*, 968 F.2d 427 (5th Cir.1992), *affirmed*, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

When Grant reported Bell on April 11, 1995, Phelps, the Human Resource Manager, quickly interviewed Bell regarding this incident. Bell was instructed by Phelps, in the presence of Leone Roberts, Maintenance Coordinator, that use of this term was a serious offense at UOP and that a future incident would be grounds for termination. A written warning notice regarding this incident was placed in Bell's personnel file. There were no further complaints levied against Bell after this warning.

When Grant reported Blaine by way of his letter on April 11, 1995, Phelps quickly began an investigation and appointed Leon Roberts to aid in the investigation. Roberts interviewed all of the employees alleged to have heard the statement allegedly made by Blaine. Roberts then reported back to Phelps that all persons interviewed denied hearing the statement allegedly made by Blaine. Phelps then called Grant into his office while Blaine was present. Blaine denied making the statement and Grant insisted that the statement was made. *See* Phelps deposition at 94–95. Based on the reports of other employees and Blaine's denial during the investigation, Phelps felt that the comment was not made by Blaine. *Id.* at 96. Nevertheless, Phelps took remedial action by warning Blaine that this was a serious matter, that it was against company policy to make racial slurs, and that another incident would be grounds for termination. *Id.* at 96.

---

**2.** In September of 1992 Grant alleges that Clary used the term "cotton patch niggers" in Grant's presence. Although a claim for this alleged act of discrimination is time barred, the court also considers this incident relevant to its hostile environment determination.

Phelps then reported the results of his investigation and remedial action to Vernon Chance, Plant Manager. There were no further allegations of such conduct by Blaine after this warning.

In both cases Phelps quickly began an investigation, interviewed the appropriate people, and considering the severity and persistence of the harassment, gave adequate reprimands to both Bell and Blaine. Not only was this action "reasonably calculated" to end the harassment in question, the evidence shows that it did end the harassment. Bell and Blaine were not reported for such conduct again. As stated in *Landgraf,* Phelps did not have to use the most serious sanction available to punish these employees, considering these were isolated events and were the first documented offense of their kind by Bell and Blaine. The action taken by Phelps was swift, reasonably calculated to end the harassment, and actually did end the harassment. Indeed, in *Garcia,* 28 F.3d at 451, an employee was verbally reprimanded for quite severe sexual misconduct and told that similar conduct in the future would result in termination. There the action was prompt and actually ended the harassment. The Fifth Circuit held that such action was prompt remedial action sufficient to allow the employer to prevail on summary judgment. The court now turns to UOP's discipline of Clary.

Grant reported Clary's comment on April 11, 1995, by a letter to Chance. Chance ordered an investigation by Phelps and also ordered that Bill Gasway ("Gasway") become involved because Clary was in his department. Chance asked Gasway to get all the facts and report back to Chance. After meeting with Clary, Gasway told him to apologize to Grant regarding the incident. Clary was also given a verbal warning by Gasway. No similar conduct by Clary was reported after this warning. Just over a month after this, on May 16, 1995, UOP received a copy of the letter sent by Grant to the Louisiana Human Rights Commission. In that letter Grant made allegations regarding Clary that were not made in the April 11, 1995 letter and were not known by UOP until May 16, 1995. On May 18 or 19, 1995, Phelps investi-gated the allegations in the letter by questioning Clary regarding each allegation. *See* Phelps deposition at 116–118. Clary denied each and every allegation. At that point Phelps went to Chance and they decided to suspend Clary. Based on the information received in the letter, and Phelps' investigation, Clary was suspended on May 19, 1995.

In Clary's case UOP took prompt remedial action reasonably calculated to end the harassment. Likewise the action taken by UOP did end the harassment. After Clary's verbal warning, there were no other reported incidents against Clary. Despite the fact that Clary was no longer being reported for misconduct, UOP further disciplined Clary after its receipt of the May 16, 1995 letter. This action was swift and also calculated to end the harassment. Additionally, it sent a message to all UOP employees that conduct such as that alleged would not be tolerated. It is clear that UOP

> took the allegations seriously, it conducted prompt and thorough investigations, and it immediately implemented remedial and disciplinary measures based on the results of such investigation. Holding a company such as [UOP] liable after it has taken such action would produce truly perverse incentives benefitting no one, least of all actual or potential victims of [ ] harassment.

*Sims v. Brown & Root Indus. Services, Inc.,* 889 F.Supp. 920, 929 (W.D.La.1995) (Stagg, J.), *citing Carmon v. Lubrizol Corp.,* 17 F.3d 791, 795–796 (5th Cir.1994). Therefore, UOP is not liable for the conduct of Bell, Blaine, or Clary as depicted above.

**D. Disparate Treatment Claims That Are Time Barred**

Grant claims Clary also treated him differently from other employees solely because of his race. He cites events in the years 1992 and 1993 as evidence of this claim. Grant's claims for the actions complained of are time barred.

Grant claims that in September of 1992 Clary used the term "cotton patch niggers" in Grant's presence. Also in that same month Grant alleges the aforementioned event with the gas powered grass trimmer.

At some time before December 1993 Grant was required to use a "swing blade" to cut grass. Sometime in 1992 or 1993 Grant and a white co-worker were required to dig a deep hole with shovels. During this time Grant alleges that Clary treated him like a "kid" by always watching over Grant while he was working.

In order to sustain a Title VII claim a plaintiff must file a charge of discrimination with the EEOC within 180 days of the alleged unlawful employment practice. 42 U.S.C. § 2000e–5(d); *Waltman*, 875 F.2d at 474. The limitations period commences on the date that the discriminatory act occurred. *Id.* Claims under Louisiana state laws against discrimination must be filed within one year of the alleged act of discrimination. *Bustamento v. Tucker*, 607 So.2d 532 (La. 1992), *citing Williams v. Conoco, Inc.*, 860 F.2d 1306, 1307 (5th Cir.1988). The statute of limitations for Grant's Section 1981 claim is adopted from the most appropriate or analogous state statute of limitations. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987). Under this standard Grant has one year from the alleged act of discrimination within which to file his claim for Section 1981 violations.

Based on the foregoing authorities, the following deadlines are applicable in this case. Grant filed his EEOC charge on April 20, 1995, making the bar date for all of his Title VII actions October 20, 1994, six months before the charge was filed. Thus, Grant's claims against Bell, Blaine, and Clary referred to in Section II, parts B and C of this opinion were timely. Grant's claims for the events occurring in September of 1992 and in 1993 are barred because he did not file his claim with the EEOC within 180 days of these acts. Grant's Section 1981 claims and state law claims of discrimination as to the acts of September 1992 and 1993 are barred because they occurred before July 7, 1994, one year before suit was filed.

■ Grant argues that his claim for the actions of Clary in 1992 and 1993 are not time barred because they are part of a continuing violation culminating in acts that occurred within the statute of limitations for these claims. Namely, the actions of Bell, Blaine, and Clary in March and April of 1995 served to bring his claims for the conduct of 1992 and 1993 under the continuing violation theory.

■ The continuing violation theory is an equitable exception which arises where the unlawful employment practice manifests itself over time, rather than as a series of discrete acts. *Waltman*, 875 F.2d at 474. The factors to consider in determining whether a claim for a continuing violation exists are as follows:

> ... The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of the most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependant on a continuing intent to discriminate?

*Id.* at 475, *quoting Berry v. Board of Supervisors of Louisiana State University*, 715 F.2d 971, 981 (5th Cir.1983), *cert. denied*, 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986).

Grant alleges four events by Clary that occurred between September of 1992 and December of 1993, when Clary was no longer Grant's supervisor. Grant does not allege any acts of discrimination against him from December 1993, until Bell's comments on March 30, 1995. These alleged acts taken as a whole were not "recurring" as contemplated by *Waltman*. Indeed, the actions of Clary in 1992 and 1993 were more in the nature of isolated work assignments or employment decisions. *See Waltman*, 875 F.2d at 475. Grant wrote a letter in October of 1994 that indicated that he felt the actions he experienced in 1992 and 1993 were acts of discrimination against him. Regarding the

degree of permanence, Grant's allegation of Clary's use of the term "cotton patch niggers" should have immediately triggered Grant's awareness and duty to assert his rights. In fact, Grant's complaint on April 11, 1995, was regarding comments very similar to this one. The acts of Clary in 1992 and 1993 were sufficient to trigger Grant's awareness that he felt he was the object of discrimination. The acts of March and April 1995, some two years later than the earlier acts, were not the only acts that indicated a degree of permanence such that Grant's awareness to assert his rights should have triggered. Therefore, Grant's claims for events occurring in 1992 and 1993 are timed barred because they do not constitute part of a continuing violation.

### E. Alleged Disparate Treatment Not Due To Grant's Race

 UOP points to the lack of evidence that Clary's requirement that Grant use the gas trimmer, dig the deep hole, use a swing blade, and was called "kid" [3] by Clary, was done because of Grant's race. Grant has not met his burden of producing evidence that these acts were due to his race. The fact that these tasks were required of Grant, a black man, is not evidence, in-and-of-itself, that there was a racial motivation for Clary's requests. Indeed, the evidence in one incident contradicts Grant's claim. Grant was required to dig the hole by shovel with a white co-worker. Even if taken as true that both Grant and the white co-worker were in disfavor with Clary, this does not point to disparate treatment of Grant *due to his race.* Mere argument and innuendo on this issue will not suffice to allow Grant to survive summary judgment. Grant must meet his burden with *evidence,* which he has not produced in this case. Grant also claims Clary unduly monitored Grant's work progress and absenteeism, but not that of other white employees. Grant has produced no evidence that this was due to Grant's race. It likely could have been due to Grant's alleged high absenteeism rate.

### F. Retaliatory Discipline

On April 18, 1995, Grant was suspended for three days due to an excessive absenteeism rate. Grant claims this was in retaliation for his discrimination complaint made on April 11, 1995. In *Moore v. Eli Lilly,* 990 F.2d 812 (5th Cir.), *cert. denied,* 510 U.S. 976, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993), the court provides the burden shifting analysis for this claim. The plaintiff must first establish a *prima facie* case of discrimination. *Id.* at 815. Once the plaintiff has met its burden, the burden shifts to the employer to articulate a legitimate nondiscriminatory reason for its action. *Id.* If the employer meets its burden and provides sufficient evidence to support the reason articulated, then the burden is on the employee to prove that the employer's proffered reasons are pretextual. *Id.* The plaintiff may prove pretext by either showing that a discriminatory reason motivated the employer or by showing that the proffered reason is unworthy of credence. *Id.*

 To prove a genuine issue of material fact as to pretext, the employee's summary judgment proof must consist of more than "a mere refutation of the employer's legitimate nondiscriminatory reason." *Id.* The employee must do more than "cast doubt on whether [the employer] had just cause for its decision"; he or she must "show that a reasonable fact finder could conclude that [the employer's] reason [ ][is] unworthy of credence." *Id.* at 815–816.

 Grant was suspended on April 18, 1995, just a week after his complaint of discrimination. UOP has produced three sepa-

---

**3.** The court recognizes that Grant claims in his affidavit that Clary also referred to him as "boy" on a particular occasion. *See* Grant affidavit at paragraph 3. As UOP points out in its Motion to Strike, Grant's deposition testimony of this incident does not include the derogatory term "boy" in Clary's response to Grant's answer. Grant points out that his affidavit is to clarify or amplify his prior deposition testimony. This court does not find the addition of the term "boy" directed at a black man to be mere supplementation or clarification. It directly contradicts Grant's previously given testimony on a genuine issue. Therefore, the court uses Grant's previously given deposition testimony at Vol. I, page 173, lines 3–7, of his deposition in its analysis of this issue.

rate warnings levied against Grant for previous absenteeism. All of these warnings occurred prior to his April 11 complaint. Thus, UOP has articulated a legitimate nondiscriminatory reason for Grant's suspension, his previous absenteeism and the absenteeism cited at his suspension. UOP has also provided documentary proof of the previous warnings and Grant's suspension as evidence supporting their articulated reasons. In order to prevail, Grant must have come forth with sufficient evidence to show that UOP's reasons are pretextual. Grant has not met the burden set forth in *Moore*.

 Grant has produced what he claims to be "absentee records" in support of his allegation that white employees had more absences than he, but were never disciplined. The submitted documents are labeled as "schedules" and are not verified as to their source, authenticity, or veracity. The information contained therein is also hearsay, and no evidence has been submitted allowing the documents to fall within the business records exception to the hearsay rule. Additionally, there is no affidavit or deposition by any UOP employee to establish how these records are kept or how they are to be interpreted. Grant proposes that these are records for the year 1994. The purported year of these records, however, is hand written on the document. This portion of the document is also hearsay. Its source is not known and it is not reliable for that reason. The court finds this "evidence" unacceptable as a basis for finding that Grant has met the standard set forth in *Moore*. Additionally, it is not admissible evidence. Grant has done no more than cast tenuous doubt, at best, on whether UOP had just cause for its decision. The proffered "evidence" does not show that a reasonable fact finder could conclude that UOP's reason is unworthy of credence. Essentially, Grant has not produced proper evidence to support a finding that UOP's proffered reasons for suspension were pretextual.

In further support of the court's decision regarding the "evidence" submitted by Grant, the court cites *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1090 (5th Cir. 1995), where the court made the same type of decision regarding evidence submitted to the district court. The court cited the proffered evidence as providing "little value." *Id.* at 1090. Based on the slight value of the proffered evidence, the court found that the "evidence could not support a reasonable juror's finding that the plaintiff was treated differently from white employees." *Id.* The decision made in *Mayberry* fully comports with the decision of this court to reject Grant's proffered "evidence" on this issue.

## G. Failure To Promote

 The same burden shifting analysis used in *Moore* is applicable for this claim. Grant claims he was passed over on all 32 "bids" that Grant made for promotions. UOP's legitimate nondiscriminatory reason is that in 30 of the 32 bids, Grant was not the senior employee, which was a UOP policy basis for denying a promotion to Grant. *See* Phelps affidavit at paragraph 15. In the other two situations, where Grant had seniority, Grant was denied the promotions because of disciplinary measures taken against him within twelve months of his bid for the promotion. *Id.* at paragraph 15, 16. Additionally, one of the non-senior employees that received the promotion over Grant was a black male. *Id.* UOP has articulated a legitimate nondiscriminatory reason for its action and has provided Phelps' deposition in support. Grant has not, however, provided evidence to show pretext.

Grant claims the discipline that prevented his promotions was applied due to discrimination. This issue has been addressed in part E above. Based on the above decision regarding Grant's discipline, and a lack of any new evidence to show pretext by UOP as to these facts, Grant's claim for failure to promote is also denied.

## H. Clary's Individual Liability

Clary was Grant's supervisor from September 1992 until March 3, 1994. After March 3 Clary had very little working contact with Grant. As to Clary's individual liability, Grant concedes that he does not have a Section 1981 claim against Clary.

 Grant claims that Clary is individually liable under Title VII as an "agent" of

UOP. In the Fifth Circuit the courts have accorded this phrase a "liberal construction." *Garcia*, 28 F.3d at 451. Under this liberal construction, immediate supervisors are employers when delegated the employer's traditional rights, such as hiring and firing. *Id.* Grant implies in his memorandum in opposition to summary judgment that his affidavit states that Clary had the power to hire and fire Grant. Nowhere in Grant's affidavit does he make this sworn statement. There is no evidence submitted by Grant that UOP had delegated the traditional role of hiring and firing to Clary. In fact, Clary did not hire Grant and was on sick leave when Grant was hired. There is no evidence that Clary had the power or authority to hire, fire, promote, or determine Grant's position at UOP. Clary supervised Grant's day-to-day work done as a member of the labor department at UOP. In fact, the evidence suggests that Clary could not even discipline Grant for his alleged absenteeism. All written warnings of Grant's absenteeism were produced by other employees of UOP. Additionally, when Clary was accused of making the statement on April 11, 1995, he was no longer Grant's supervisor. Therefore, it stands to reason that Clary was not an agent of UOP as defined in *Garcia* as this definition applies to supervisors. At the time Clary made this statement, under *Garcia*, he was not an "agent" for Title VII purposes.

### I. Intentional Infliction Of Emotional Distress

For Grant to recover for intentional infliction of emotional distress, he must establish (1) that the conduct of the defendants was extreme and outrageous; (2) that his emotional distress was severe; and (3) that the defendants desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from its conduct. *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La.1991). In *White*, the court explained:

> The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. Liability does not extend to

mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities. Persons must necessarily be expected to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind. Not every verbal encounter may be converted into a tort; on the contrary, "some safety valve must be left through which irascible tempers may blow off relatively harmless steam."

*Id.* at 1209, *quoting* Restatement (Second) of Torts § 46, comment d; Prosser and Keaton, *The Law of Torts*, § 59 (5th ed.1984). Intentional infliction of emotional distress is often seen in the workplace because of the authority an employer inherently possesses over his employee. *Id.* at 1209–10. Thus, an employee is given greater protection from one with authority over him than if he were a stranger.

> [D]isciplinary action and conflict in a pressure-packed workplace environment, although calculated to cause some degree of mental anguish, is not ordinarily actionable. Recognition of a cause of action for intentional infliction of emotional distress in a workplace environment has usually been limited to cases involving a pattern of deliberate, repeated harassment over a period of time.

*Id.* at 1210. In any event, the distress suffered must be so extreme that no reasonable person could be expected to endure it. *Id.*

In *Bustamento v. Tucker*, 607 So.2d 532 (La.1992), the Louisiana Supreme Court recognized that conduct which, standing alone, would not give rise to an intentional emotional distress claim, can become actionable "because of its continuous, cumulative, synergistic nature...." *Bustamento*, 607 So.2d at 542.

The allegations made by Grant regarding the alleged statements made by Bell, Blaine, and Clary do not meet the standards set forth in *White* or in *Bustamento*. By this ruling the court is careful to note what it does not hold. The court does not hold that use of the term "nigger" or any other similar racial epithet is condoned in today's society or in the workplace. The court does not hold

that use of this term does not seriously offend any person of the African–American race. This court does hold, however, only under these specific circumstances, based only on the evidence before it, that the three statements made in the presence of Grant do not meet the heightened standards of *White* or *Bustamento*. Though truly offensive, the use of this term three times in Grant's presence does not raise its use in this particular context to a tort. Therefore, Grant's claims against UOP and Clary individually for intentional infliction of emotional distress are **DENIED**.