IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 96-31121
Summary Calendar
_____

JAMES E GRANT, JR,

Plaintiff-Appellant,

v.

U O P, INCORPORATED,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Western District of Louisiana
(95-CV-1240)
_____

July 23, 1997

Before KING, JOLLY, and DENNIS, Circuit Judges.

PER CURIAM:[*]

James Grant appeals the district court's grant of summary

judgment in favor of UOP, Inc. Finding no error, we affirm.

I. BACKGROUND

A. *Statement of Facts*

Grant, an African-American male, began working at Universal

_____

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

1

Oil Products ("UOP") in the labor department in June 1992. Claude Clary was Grant's supervisor from September 1992 until March 3, 1994.

Grant claims that in a conversation with Clary in September 1992, Clary referred to two other black employees as "cotton field niggers." Clary also referred to Grant as "boy" and "kid" on several occasions and told white co-workers that he could "dress Grant up" but that he could not "take him to town."

Clary assigned tasks to Grant that Grant felt were onerous. For example, Clary required Grant to use a gasoline trimmer to cut grass around a pond for approximately two weeks. On a different occasion, Clary required Grant to use a swing blade to cut weeds, instead of an automated weed trimmer. Grant alleges that Clary stated that he would "break" Grant before he retired and make him into a "good hand" yet. Also, Grant and a white co-worker were required to spend several days digging a ditch with shovels to find a leak. Grant thought a backhoe was the more appropriate tool for the job.

Throughout the time period that Clary supervised Grant, Grant thought that Clary was very critical of his work. However, Grant does not complain of any conduct occurring between December 1993 and March 1995.

On April 11, 1995, Grant made a written complaint to Vernon Chance, the Plant Manager, regarding three alleged instances of racial discrimination that had occurred in the prior two weeks.

2

Grant's allegations are as follows: First, on March 30, 1995, Larry Bell, a co-worker with no supervisory authority over Grant, told Grant that "niggers can't weld" and used the phrase "nigger, please" in Grant's presence. Second, on April 3, 1995, Jimmy Don Blaine, also a co-worker of Grant's, told Grant that Grant's opponent in a recent karate match was probably thinking to himself that "this damn nigger is gonna whip my ass." Third, on April 11, 1995, Clary, who was no longer Grant's supervisor at the time, explained to Grant what he viewed as the difference between a nigger and a black man.

Chance and Harlan Phelps, UOP's Human Resources Manager, investigated the alleged incidents. Following their investigation and discussion with the individuals involved, they placed a written warning notice in Bell's file and orally warned Bell, Blaine, and Clary that the use of racial slurs was a serious offense and that any future incident would be grounds for dismissal. There were no further complaints against the three men.

On April 18, 1995, Grant was suspended for three days pursuant to UOP's policy regarding excessive absenteeism. Grant had received both an oral and a written warning prior to his suspension advising him that his absenteeism rate -- at the times of the warnings as high as 17.8% and 15.9% respectively -- was unacceptable and would result in a disciplinary layoff if it continued.

3

On May 16, 1995, Phelps was made aware of additional claims by Grant against Clary, based on earlier statements made by Clary -- such as the reference to "cotton field niggers" -- and work assignments from Clary that Grant deemed onerous. On May 19, 1995, Clary was suspended until his forced retirement on May 31, 1995.

*B. Procedural History*

Grant filed claims with the Louisiana Human Rights Commission and the Equal Employment Opportunity Commission on April 18, 1995, and April 20, 1995, respectively. On July 7, 1995, Grant filed suit against UOP and Clary alleging racial discrimination in violation of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Grant also asserted state law claims for discrimination and intentional infliction of emotional distress.

Grant alleged that he had been subjected to a hostile environment because of the racial remarks and harassment by Clary and other employees at UOP. Grant further claimed that he and other black employees had been subjected to disparate treatment based on their race. Grant also asserted a claim for retaliation based on UOP's placing him on disciplinary leave for excessive absences within days of his complaint of discrimination.

Both UOP and Clary filed motions for summary judgment on the ground that there was no genuine issue as to any material fact.

4

The district court granted these motions on October 4, 1996. Grant timely appealed the grant of summary judgment in favor of UOP.[1]

## II. DISCUSSION

We review the granting of summary judgment de novo, applying the same criteria used by the district court. Norman v. Apache Corp., 19 F.3d 1017, 1021 (5th Cir. 1994). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

On appeal, Grant argues that he has presented genuine issues of fact as to whether there was a racially hostile environment, whether UOP took prompt remedial action, and whether he was disciplined in retaliation for making a complaint of racial discrimination.

*A. Hostile Environment Claim*

Title VII of the Civil Rights Act of 1964 makes it unlawful "for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-

---

[1]Grant does not appeal the district court's ruling to the extent that it dismisses Clary from personal liability.

5

2(a)(1).  Courts have interpreted the language of Title VII to provide a cause of action to a person who is subjected to a discriminatorily hostile work environment.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  The Court in Harris determined that Title VII is violated when "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Id. (quoting Meritor Sav. Bank v. Vinson, 477 U.S. 57 (1986))(internal citations omitted).

In order to establish a claim against an employer for a hostile work environment, an employee is required to show that (1) he belongs to a protected group, (2) he was subject to harassment, (3) the harassment was based on the protected characteristic, (4) the harassment affected a term, condition, or privilege of employment, and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action.  Jones v. Flagship Int'l, 793 F.2d 714, 719-20 (5th Cir. 1986), cert. denied, 479 U.S. 1065 (1987).

Even assuming arguendo that the incidents identified by Grant establish a valid hostile environment claim, UOP can not be held liable because it took prompt remedial action that was reasonably calculated to end the harassment.  Garcia v. Elf Atochem N.A., 28 F.3d 446, 451 (5th Cir. 1994).  When Phelps

6

received Grant's letter on April 11, 1995, he immediately investigated the complaints and interviewed the three men whose statements had offended Grant.[2]

When confronted about the incident in question, Bell denied saying "niggers can't weld," but admitted saying "nigger, please." Phelps informed Bell that the use of the term "nigger" was a serious offense at UOP and that any future incident would be grounds for dismissal. Bell apologized to Grant, and a written warning notice was placed in Bell's personnel file. There were no further complaints against Bell.

UOP management interviewed the employees present when Blaine's statement about Grant's karate opponent was allegedly made. All of the people present denied hearing the statement. Phelps then called both Grant and Blaine into his office. Grant insisted that Blaine did make the statement at issue, and Blaine denied it. Based on the evidence before him, Phelps felt that Blaine had not made the statement. Phelps nevertheless warned Blaine that it was against company policy to make racial slurs and that any future incident would be grounds for dismissal. Phelps then reported the actions he had taken to Vernon Chance, the Plant Manager. There were no further complaints against

_____

[2]Grant argues for the first time on appeal that he complained about the racial harassment he was experiencing to his superior, Jay Davis, before the April 11 letter. Arguments raised for the first time on appeal will not be considered by this court. See James v. McCaw Cellular Communications, Inc., 988 F.2d 583, 585 (5th Cir. 1993).

7

Blaine.

Chance ordered an investigation of Clary by Phelps and also ordered Bill Gasway to become involved because Clary was in his department. When Gasway met with Clary, Clary expressed surprise that his comments had offended Grant and offered to apologize, which he did the next day. Gasway gave Clary a verbal warning. There were no further complaints against Clary.

On May 16, 1995, UOP received a copy of the letter Grant sent to the Louisiana Human Rights Commission from Grant's attorney. The letter detailed the alleged harassment and discrimination that Grant faced from September 1992 until December 1993. Phelps questioned Clary regarding each allegation in the letter, and Clary denied all of them. Regardless of Clary's denial, Phelps and Chance decided to suspend Clary. Clary was suspended on May 19, 1995, and was ultimately forced into early retirement on May 30, 1995.

The remedial action taken by UOP was both prompt and effective. Not only was it reasonably calculated to end the harassment, but it actually did so. No further complaints were made against Bell, Blaine, and Clary after the three men were reprimanded. When further allegations regarding Clary came to light a month later, UOP immediately suspended Clary, pending his forced retirement.

Grant's argument that UOP did not take sufficiently drastic or wide-sweeping action falls in the face of Fifth Circuit

8

precedent. Grant objects to the fact that beyond the warning that any further incident could result in dismissal, no disciplinary action was taken against Bell, Blaine, and Clary. Grant also complains that UOP limited its reprimand to the three men reported by Grant, instead of making a point of informing all the UOP employees that racial slurs would not be tolerated.

"What is appropriate remedial action will necessarily depend on . . . the severity and persistence of the harassment, and the effectiveness of any initial remedial steps. <u>Garcia</u>, 28 F.3d at 451. The court in <u>Garcia</u> ruled that the reprimand of a harasser and a warning that further harassment would result in termination was sufficient to protect an employer from liability under Title VII because the action was not only "prompt and reasonably calculated to end the harassment, but the harassment actually ended." <u>Id</u>. Based on the standard articulated in <u>Garcia</u>, no issue of material fact exists regarding UOP's liability for the alleged hostile work environment.

*B. Retaliation Claim*

Grant argues that there is a material fact issue as to whether his three-day suspension for excessive absenteeism was retaliatory. The elements of a cause of action for retaliation are: (1) the plaintiff engaged in a protected activity, (2) the plaintiff suffered an adverse employment decision, and (3) the adverse decision was motivated by the protected activity such

that there was a causal connection between the two.  Mattern v. Eastman Kodak Co., 104 F.3d 702, 705 (5th Cir. 1997).  The third element may be established by direct evidence of retaliatory animus or by indirect evidence of disparate treatment.  Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1216 (5th Cir. 1995)(age discrimination).

Grant argues for the first time on appeal that Clary's use of racial slurs constitutes direct evidence of retaliatory animus. See Brown v. East Miss. Elec. Power Ass'n, 989 F.2d 858, 861 (5th Cir. 1993)(concluding that "routine use of racial slurs constitutes direct evidence that racial animus was a motivating factor in the contested disciplinary decisions" where person using slurs participated directly in disciplinary decisions).  We need not address this argument because it was raised for the first time on appeal, but we note in passing that Brown is inapplicable in this context because Clary did not directly participate in the disciplinary action taken against Grant. Thus, Grant must attempt to establish the third element of retaliation by indirect evidence of disparate treatment.

When a plaintiff uses the indirect method of proof, the McDonnell Douglas sequence of proof and Burdine allocation of burdens apply.  Mooney, 54 F.3d at 1216.  We set forth this evidentiary scheme in Rhodes v. Guiberson Oil Tools, 75 F.3d 989 (5th Cir. 1996)(en banc). If the plaintiff establishes a prima facie case, the defendant must come forward with a legitimate,

10

non-discriminatory reason for the employment action taken.  Id. at 992-93.  The burden then shifts back to the plaintiff to prove that the defendant's reason is merely a pretext for discrimination.  Id. at 993.

Grant claims that he was suspended in retaliation for filing a written complaint.  UOP contends, however, that Grant was suspended for excessive absenteeism.  At UOP, the absenteeism rate is not calculated simply upon how many days an employee missed work, but is calculated by dividing the scheduled hours missed by the scheduled hours worked.  An absenteeism rate above 5% is considered unacceptable.  UOP has well-documented evidence that it followed its standard progressive discipline procedure in issuing first an oral warning in September 1994 when Grant's absenteeism rate was 17.8%, then a written warning in November 1994 when Grant had an absenteeism rate of 15.9%, and then suspending Grant in April 1995 when Grant had an absenteeism rate of 10.23%.

Grant did not object to UOP's evidence at trial, but on appeal he points to his deposition, in which he testified that he "only missed five sick days that entire year."[3]  Regardless of the number of days Grant missed, Grant put on no evidence to

_____

[3]Later in his deposition, however, Grant testified that, in addition to sick days, he missed at least ten days in the fall of 1994 to be at home with his wife, who was having a difficult pregnancy.

11

challenge the absenteeism rates put forward by UOP.[4]  Grant did not meet his burden of proof by showing that UOP's stated reason for the three-day suspension was pretextual.  Thus, the district court correctly granted summary judgment on the issue of retaliation.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[4]Grant also argues that he was discriminated against because other white employees violated the absenteeism policy with impunity; however, Grant introduced no competent evidence to support this theory before the trial court.